Good morning, Your Honors. May it please the Court, Krista Hart on behalf of Tien Nguyen, appellant in this case. My goal is to reserve three minutes for rebuttal. This case, the main focus in this case, I think, has to be on the question of whether the ex post facto clause was violated here, and that's inextricably intertwined with the victim enhancement that was imposed in this case. Did you raise that before the district court? It was raised trial — I was not trial counsel. Well, I know you weren't, so I'm letting you just explain. I mean, you — you're — I mean, frankly, I didn't think it was raised before the district court. Well, trial counsel, while did not specifically use the phrase ex post facto clause, trial counsel did cite to the rule as it was in effect in 2006, cited to case law, FOMM in particular, which was the — interpreted the rule as it existed in 2006. At the sentencing hearing, trial counsel referenced the Amendment 726. We're really not talking about whether it's 2006 or not. We're talking about the definition of the victims, aren't we? Correct. But — but trial counsel specifically referenced the amendment, which went into effect and said, notes to the court, it was amended and went into effect in 2008. So trial counsel absolutely discusses the new amendment, 726. And aside from that, when trial counsel raised it in their sentencing memo, the government, in their sentencing memo, actually did raise the ex post facto issue and noted that Well, but just because the government raised it doesn't really help you, does it? It does, because it's clearly before the court. The court is aware of it. Well, frankly, I understand that the court did not adopt the definition of victims that would have been different than what would have been applied at the time that they should have used. Quite frankly, from the record, I can't tell what rule the court adopted. The court — It seems to me that what the court didn't adopt the definition of victim that included individuals whose means of identification were used unlawfully or without authority. But the problem is, whether or not the court adopted the new rule, it explicitly said it adopted the findings and recommendations of the presentence report, which Well, but it did say that. But it also said we're going to do victims as it existed before. At the time when the offense was committed, we're not going to do the new victims definition. I would disagree. I don't think that's what the court said. The court merely adopted what the probation officer said. And the probation officer's interpretation of the 2006 rule was incorrect, because here we have only two parties who identified an actual loss. So under the — Let me get you to that, because the two parties, I'm assuming you're talking about Walmart and Fairwind's credit union. Correct. Let me direct your attention to — actually, this was a submission that the defendant submitted before the district court. It's Appellant's Excerpts of Record, page 133. And if I recall correctly, this was submitted as an exhibit to the defense sentencing position paper. Yes. And the sentencing position paper referenced Mr. Wynn using Denise K. Tran as an alias. And I'm looking now at the bottom of page 133. It talks about Mr. Wynn withdrawing cash from numerous other institutions as well. Why isn't that sufficient evidence to support the enhancement? And I look here. There are eight additional banks referenced, Hawaii Pacific, Anheuser-Busch Employees Credit Union, First Citizen State Bank, Federal Credit Union, National First Credit Union, Arizona State Savings Community Educators Credit Union, and Associated Bank. And he says, under the alias Denise Tran, he lists those banks, and he said those are the new iCash this week. Because under the rule as it existed in 2006, it's a two-part test. First, there has to be an actual loss defined, quantified. That means there has to be a number associated with it. We don't have that for any of those institutions. The second part of the rule says that that loss has to be included within the loss calculation under the loss calculation guideline. And the loss calculation, this case, only addresses the that formula $500 per access device, and they use the $500 times the 13,000 access devices to come up with the $18 million figure. The two specific amounts to Walmart and Fairwinds were not even included within the amount of loss calculation. So even those two are not don't fit within the definition of a victim as it existed in 2006. Ginsburg. Getting back to the ex post facto argument for a moment, the district court's position was consistent with PSR, but wasn't that also consistent with the defense position? The government wanted six levels, defense wanted two, PSR recommended two, the district court went with two? No. I believe the defense argued for zero under the two victims, under the victim enhancement. They argued that there shouldn't be any. All right. Any further argument, Counselor? I think the ex post facto is the main issue. So unless Your Honors have any questions about the amount of loss calculation at this point. Otherwise, I'll wait for rebuttal. Okay. Thank you. Good morning, Your Honors. May it please the Court. Matthew Siegel for the United States. I also represented the United States in the sentencing in this case in district court. What the defendant's attorney said at sentencing to the district court is at excerpts of record page 186. What he said was the PSR adopts the definition that we have suggested. So it seems hard for the defendant to dispute the method of loss calculation in this case, the method of victim counting, excuse me, as inconsistent with ex post facto or FAM or anything else. So that's what you would review de novo. The next question is how do you look at the number of victims in a large scale identity theft case? And I want to start by first pointing out what the defendant has not responded to at all in the reply brief. The same guidelines specific offense characteristic that assigns a two level enhancement for 10 victims or more also instructs district courts to assign a two level enhancement if it's accomplished by mass marketing. And if you look down at application note four, that includes by spamming. And it's really, it's uncontested here that the way that the phishing was accomplished was you send out emails that look like they come from somebody's bank, they get them, click through, and then the person has their information. The next question. But as I understand it in reading the PSR, it doesn't attribute any loss to banking institutions. There's a credit union that submitted a. There's a credit union. A victim impact statement of the Fairwoods Credit Union. Right. But that's it, right? That's right. And so the method of loss, the method of loss calculation depends entirely in this case on the $500 per access device formula. A separate question is then who suffered pecuniary loss or how many institutions suffered pecuniary loss such that they count as victims. Right. So it's permissible for the court, for the district court, for example, to go on the loss side and say, okay, there were 37,800 credit profiles. We're going to multiply those. There were 37,800 fraudulently obtained access codes. And then? Times 500 and you get your loss figure for the loss table. Then moving down to B1.1, the next question is, okay, well, how many victims are there? And in a case of this scale, the district court is never going to you're just never going to send out 37,000 victim notice letters that say, hey, was your was your debit card number used? Could you please tell us? But they could come up with ten institutions, I would think. There were ten identified. There were ten identified, and the district court certainly did not abuse its discretion in saying, we have here what is obviously an extremely successful scheme. Right. Not just from Price and Ruland up in Northern California, who are both using the account opening scheme at Walmart, but also are getting reencoded debit cards and credit cards from Wynn and using them. And Wynn, when the search warrant happens, has cards like that in his house. So so long as the district court or the record demonstrates at least ten financial institutions that have suffered an actual loss, is there anything more that's required for the district court to count those as victims? No. No. And then we're done. I think that's right. I think, well, it's my understanding, maybe I'm trying to follow you. It seems to me that what you're saying is, because there's 37,800 fraudulently obtained access codes, so what is the amount of money that's reported from the multiple banks to be lost because of the fraud? We'll never know. How do we know it's in excess of 600,000? In excess of 600,000? Do we know? No. The only thing we know is it's between $100 and $500 in the amount of each withdrawal. Is that all we know? No. What we know is that the guidelines instruct that there's a $500 floor per access device, no matter what the actual or intended loss was. That's yellow. And so you're not actually counting loss. You're calculating a figure that's then going to be applied to the loss table. That is a presumptive floor below which loss cannot fall. Then, as Judge Winn points out, then you think, okay, under the circumstances of this case, where it appears that it was an extremely successful scheme, not only in northern California, but at paragraph 21 of the PSR, the defendant's brother tells Price that they had people, crews in Orange County doing withdrawals, and one woman was doing 45 or 50 cards a day worth of withdrawals. Was the district court on a deferential standard of review in error for saying, well, you know, when the Secret Service does a forensic review of the defendant's computer, he finds all these phished websites, finds the chat logs where he's admitting to his co-conspirator, here's a list of banks that I cashed out on today. The defendant got a break in this case. We had asked for over 250 victims because this was before Pew, and we wanted, you know, to count as many as individuals' names had been used. The defendant got the method of loss calculation that he wanted. There's abundant evidence that there was a successful scheme, and these are the banks where the information was coming from. I just, I don't. How many months did this conspiracy go on? We know that he was with Price and Rulin for a year, and what Rulin said, these were the two who were running the Wal-Mart scheme. Right, right. We know that he was with Price and Rulin for a year, and we know that the fruits of the Wal-Mart scheme, I think, equaled a couple of hundred thousand dollars in the, maybe $290,000 in the previous 60 days. They got that from Wal-Mart Video. And we also know that the defendant was arrested in Southern California about a year prior to his arrest in this case, and he's got, you know, he's in a room with a credit card encoder and things like that. So I think it's fair to say a year, but we'll never really know. There were three enhancements challenged in this case. One is the loss, which you addressed, and then the number of victims, more than ten institutions, ten institutions or more, to support the number of victims involved. And then the district court also aggravated or enhanced the sentence based on role in the offense. Is that correct? Yes, Your Honor. And can you address that? Where's the evidence of recruitment versus having people he worked with in a buyer-seller type relationship where he played one role providing the information, and they basically went out and used it? He's not just — well, there are a number of places, and you can look at the whole record. I would — paragraph 21 is one place where the defendant's brother tells Price that they had people working for them in Southern California. Another place is in the chat logs that are in the excerpts of record where the defendant is explaining to them how to use a credit card encoder and how to do this. Giving those kinds of instructions is managing. It just is. And the defendant's — other people are going out and taking the risk of using these cards, and the defendant's getting his cut. The district court certainly did not abuse his discretion. And, in fact, this is another one of these factors where, in my view, the defendant caught a break. Because if you — as we argued below, if the district court had wanted, it easily could have found five participants and given the defendant a three-level enhancement instead of a two-level enhancement. I mean, just the nature of this scheme is he's the source of the identities. He's at the apex of the pyramid. They're going down, not in a buy-sell relationship the way you would in, like, narcotics trafficking, for example. He's getting money back when people are using successful cards. He's telling Price, go try these cards and report to me back which ones work, and from that I can infer which other cards on the list are valid. And that's an ongoing relationship that lasts a year that goes far beyond kind of an independent contractor. So that's my view of the leadership adjustment, Your Honor. Any other questions? Thank you, Counselor. Thank you, Your Honor. I think you have some time, Counselor, if you'd like to reply. Part of the government's argument exemplifies why it's important for the district court to make specific findings regarding the objections in this case, because we have a record here which is unclear at best. At one point, the district court indicates it adopts the findings and recommendations of the presentence report, which includes reliance on the 2010 guidelines. But then the government says, well, that might be true. We know that he really didn't. The district court really didn't do that because we think he actually used the 2006. And so we don't have a real clear record here. And so the government goes on to rely on a different guideline to say, well, this would be harmless error because he would have gotten an enhancement under this other factor, which, quite frankly, that wasn't presented to the district court. The defendant didn't have a chance to analyze that or consider the evidence in relation to that. So I don't think you could go back and just say, well, this is all what could have happened. We have to look at what did happen. And what happened to the district court? Really saying the district court did not comply with Rule 32? Yes. Well, the district court did overrule all the objections of both parties, didn't it? It did. It overruled the objections without holding the government to the burden of proof, went into the factual objections. I understand your argument, but I'm just trying to take you through now what I've got to find if they did comply with Rule 32 or not. They have to make required findings, determinations at the time of sentence, but they don't have to be detailed or lengthy. So I'm trying to apply Ingham into this particular case. And so they overruled all the objections. He adopts the PSR factual findings. And I guess I'm trying to figure out how much more I can require. Well, the problem with that is, is while the district court says that it overrules all objections, it doesn't really address the objection having to do with victims. And so that's glossed over without ever really analyzing the issue. And so we don't know. We're left with a record where we don't know what the district court does. The government argues that the district court used the 2006 guidelines in the context of counting victims. I disagree with that. I say the district court did not use the correct standard. Well, let me – when I asked you, counsel, with regard to your ex post facto argument in terms of how victim is defined, I asked you whether the district court adopted the PSR, which then adopted your definition that that results in a two-level enhancement instead of the six that the government asked for. You told me that the defense had argued below for no enhancement based on victim. So the government provides the site, which I had recalled, that basically during the sentencing hearing, and I'm looking now at page 186, line 22, where defense counsel said the PSR adopts the definition that we have suggested. So if there's a different section in the record that indicates a contrary argument, it would be a good idea for you to give me the site so I can look that up later. The defense counsel, in concluding the sentencing memorandum, when laying out the chart for the – what it believes the – how the offense level should be calculated, specifically indicates, and that's at excerpts of record 114, that there is no proof for the number of victims, and therefore, the upward adjustment should be zero. So the defense – Sotomayor, that's a different question, right? There's two – there's two questions. One is, what is the proper definition utilized by district court in terms of victim, whether it's the 2006 guidelines or the subsequently amended guidelines? And then the second question is whether there's proof of the number of victims. And that's why I referred you to the chat logs where Mr. Wynn indicated that he had cashed out from various financial institutions. There were at least eight, plus two identified in the PSR. That adds up to ten to me. So there are two – there are two different questions altogether. Okay. So I will address the last question first. So the definition of victim in the 2006 guidelines is, one, they have to prove an actual loss, an amount, and, two, that loss amount has to be included in the $18,900,000. We know that that's not the case. We have two individuals that submitted statements concerning loss, the two financial institutions, and they add up to roughly $600,000 and some change. That $600,000 and some change was not included in the loss amount. So the second prong of the test of victim is not met. And I would argue the first prong, all they have is actual loss for two victims. They don't have actual loss for ten victims. There is no amount of loss. There is no financial institution aside from those two that comes forward and says, yes, I suffered a loss. All right. I understand your argument. Thank you. Thank you. Your time has expired. Thank you. This case, Case 11-10406, United States v. Wynn, is submitted.
judges: Quist, Smith, Nguyen